# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CIVIL ACTION NO. 1:14-CV-161-RLV

| | |
|---|---|
| **BARRY G. WHITE,** ) ) **Plaintiff,** ) ) v. ) ) **CAROLYN W. COLVIN,**[1] ) ) **Defendant.** ) ) | **ORDER** |

**THIS MATTER IS BEFORE THE COURT** on cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Docs. 9, 13). Also before the Court are supplemental filings concerning the applicability of *Mascio v. Colvin*.[2] (Docs. 18, 19).

## I.     FACTUAL BACKGROUND

Plaintiff Barry G. White appeals the denial of his application for social security disability insurance benefits by the Commissioner of the Social Security Administration ("Commissioner").

Mr. White alleges that he has been disabled since October 31, 2011 due to chronic neck and back pain, anxiety and depression, and hypertension. The original application was submitted with an alleged onset date of October 21, 2009.

Mr. White's history of past relevant work was in construction as a "working foreman." His working foreman position involved heavy manual labor. Mr. White testified that, after working in this role for the last fifteen years of his career, he was approached by his superiors and advised

---

[1] Carolyn W. Colvin is the acting Commissioner of the U. S. Social Security Administration.

[2] 780 F.3d 632 (4th Cir. 2015).

that his schedule would be reduced or he would be laid off. Reportedly, Mr. White's superiors observed that Mr. White had increasing difficulty with the physical demands of his job. Mr. White has not worked since that date.

Mr. White's neck and back pain are attributed in part due to an earlier injury and in part due to the strenuous demands of his prior work in the construction industry. (Tr. 20). Mr. White was in a car accident at age nineteen and sustained an injury to his neck, entailing persistent effects.

According to Mr. White, his neck pain "runs from the back of [his] head . . . [r]ight at the base of [his] skull down through the middle of [his] shoulder blades." (Tr. 41). Mr. White states that his pain is "constant" and feels like somebody stabbing a knife through the back of [his] neck . . . twisting it around." (Tr. 41−42). Mr. White also testified that he has "pains that shoot up the back of [his] neck through [his] head" on a daily basis. (Tr. 42). Mr. White testified that the episodes of shooting pain occur more than once a day and last 30 minutes to an hour. (Tr. 42). Mr. White reports that the shooting pain requires him to lie down and that rest helps reduce the pain. (Tr. 42). Mr. White represented that the pain in his back is also constant and "starts about six inches above [his] belt line down through [his] hips and runs down [his] right leg." (Tr. 42).

In the fall of 2011, Mr. White underwent several tests and procedures to explore the nature and cause of his neck and back pain.

On September 12, 2011, an MRI of Claimant's cervical spine was performed. The MRI revealed "mild straightening of the spine suggestive of a myofascial etiology, with mild disc desiccation noted at C5−6 with central effacement of the canal with no significant nerve root impingement, and at C6−7 mild disc protrusion present bilaterally, left greater than right, without significant nerve root impingement." (Tr. 370).

On October 26, 2011, lumbosacral spine x–rays were performed. There was "no evidence

of fracture, dislocation, or subluxation." (Tr. 370).

Claimant's primary care physician, Dr. Deepak Gelot, referred Claimant for his first neurological evaluation. (Tr. 20–21).

In November 2011, Dr. Steven K. Gudeman, Neuroscience & Spine Center of the Carolinas, LLP, examined Mr. White for purposes of neurosurgical evaluation. (Exh. 12F) (Tr. 370). Claimant reported chronic progressive pain (posterior cervical, bilateral arm, low back/bilateral leg) for the last twenty-six years that is exacerbated with activity. (Tr. 370). On examination, Dr. Gudeman observed:

> Palpation of the cervical, thoracic, and lumbar spine reveals midcervical and lower lumbar tenderness. Range of motion of the cervical spine is approximately 80%, with subjective discomfort with turning. Flexion of the lumbar spine is performed to 40 degrees; extension 0 degrees. He is able to stand on heels and toes without difficulty. Straight leg raising is negative giving way secondary to pain. No muscle atrophy or decreased tone is noted. Reflexes are 1+ bilaterally including biceps, triceps, brachioradialis, knee jerks, and ankle jerks. Plantar responses are absent. Sensory examination reveals decreased sensation distally both in the arms and legs but he is able to discern pinprick in all locations. Positive Tinel's is present at the left elbow. Gait is unremarkable other than being somewhat stiff.

(Tr. 370). Dr. Gudeman summarized Mr. White's earlier test results and concluded with the following impression: "Chronic cervical, bilateral arm, low back/bilateral leg pain which I believe is more of a myofascial etiology . . . ."[3] (Tr. 370). Dr. Gudeman recommended physical therapy and chiropractic management of symptoms. (Tr. 370). Dr. Gudeman opined that Mr. White "would not benefit from any surgical intervention . . . ." (Tr. 370).

In January 2012, Mr. White attended a Pain Clinic. (Exh. 9F). Upon intake, Dr. Adelle Anthony-Williams noted that Claimant had limited range of motion of the cervical spine consistent with Dr. Gudeman's findings. (Id., 7). Dr. Anthony-Williams did not detect any sensory

---

[3] "Myofascial pain is the pain of, or relating to, the fascia surrounding and separating muscle tissue." *Brenner v. Hartford Life and Acc. Ins. Co.*, 2001 WL 224826, at * 1, n. 2 (D. Md. February 23, 2001) (citing Stedman's Medical Dictionary 1173 (27th ed. 2000)).

abnormalities. (Id., 7).

In February 2012, Dr. Adelle Anthony-Williams proposed a trial of cervical epidural steroid injections and an anti-inflammatory medication. Dr. Anthony-Williams' assessment indicates that she sought to get Mr. White in "fairly quickly" for steroid injections. (Tr. 335). If the steroid injections proved successful, physical therapy would be an option to help with muscle strengthening and postural issues. (Tr. 335). Mr. White ultimately declined injection therapy. (Tr. 21). Nonetheless, Mr. White was referred to physical therapy. Mr. White only attended twice and claimed that his neck became swollen after his first therapy appointment. (Tr. 21); (Exh. 8F, 10).

In March 2012, Dr. Matthew Matthew, an associate of Dr. Adele Anthony-Williams, prescribed a new pain medication (Nucynta) for Mr. White that significantly reduced Mr. White's symptoms.[4] Mr. White reported that, on a scale of 1 to 10, with 10 being the most painful, his overall pain went from between a 9 and a 10 to about a 5 with the Nucynta regimen. (Tr. 44). Mr. White testified that the Nucynta helped him to move around the house more but denied being able to work. (Tr. 44). According to Mr. White, movement and activity cause his pain to increase even when on the Nucynta. In other words, Mr. White testified that while his symptoms had improved, the pain was still there with or without medication. (Tr. 43−44).

Mr. White began treatment with Larry E. Cummins, M.D., a psychiatrist, in December 2010.[5] (Exh. 2F). On May 1, 2011, approximately six months into treatment and at Claimant's request, Dr. Cummins filled out a form provided by counsel for Mr. White entitled, "Mental Residual Functional Capacity Questionnaire." (Exh. 3F) (Tr. 282−86). According to Dr.

---

[4] Dr. Matthew Matthew is the correct name.

[5] At time of the ALJ's decision, Mr. White had been receiving treatment from Dr. Cummins for approximately two years. (Exh. 10F) (Cummins' Progress Notes 12/10 thru 8/12).

Cummins, Claimant suffered from a Panic Disorder (Axis I) and Chronic Back and Neck Pain (Axis III) with a Global Assessment of Functioning ("GAF") of 65.[6] (Tr. 282). Dr. Cummins noted that Claimant benefitted from his prescribed medication, Xanax, which reportedly improved his anxiety and irritability. (Tr. 282). Dr. Cummins identified Claimant's symptoms as "Generalized persistent anxiety" and "Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." (Tr. 283). In addition, Dr. Cummins noted Claimant was "Seriously limited, but not precluded" from the following:

> **UNSKILLED WORK**
> -Maintain regular attendance and be punctual within customary, usually strict tolerances;
> -Work in coordination with or proximity to others without being unduly distracted;
> -Complete a normal workday and workweek without interruptions from psychologically based symptoms;
> -Accept instructions and respond appropriately to criticism from supervisors;
> -Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;
> -Deal with normal work stress;
>
> **SEMISKILLED AND SKILLED WORK**
> -Understand and remember detailed instructions;
> -Carry out detailed instructions;
> -Set realistic goals or make plans independently of others;
> -Deal with stress of semiskilled and skilled work; and

---

[6] GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social and occupational functioning." American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 1994) (DSM-IV). A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, familiar relations, judgment, thinking, or mood. *Id*. A score between 41 and 50 indicates serious symptoms, such as suicidal ideation, serious impairment in social, occupational or school functioning. *Id*. A score between 51 and 60 indicates moderate symptoms, such as occasional panic attacks or moderate difficulty in social, occupational or school functioning. *Id*.

    -Use public transportation.

(Tr. 284−85). With one exception, there were no categories of activities or functions identified where Claimant was "Unable to meet competitive standards" or was deemed "No useful ability to function." (Tr. 284). Dr. Cummins notes are indeterminate as to his rating for Mr. White's ability to "[p]erform at a consistent pace . . . ." (Tr. 284) (text in original document is illegible). Rather than a check mark, there is a straight line between the blocks for "Seriously limited, but not precluded" and "Unable to meet competitive standards." (Tr. 284).

  Significantly, Dr. Cummins noted that Claimant was "Unlimited or Very" capable of these tasks:

> **PARTICULAR TYPES OF WORK**
> -Interact appropriately with the general public;
> -Maintain socially appropriate behavior;
> -Adhere to basic standards of neatness and cleanliness;
> -Travel in unfamiliar places.

(Tr. 285). Moreover, Dr. Cummins opined that Mr. White was either "Unlimited or Very Good" or "Limited but Satisfactory" in the following categories, all of which bear upon Claimant's ability to perform unskilled work:

> **UNSKILLED WORK**
> -Remember work-like procedures;
> -Understand and remember very short and simple instructions;
> -Maintain attention for two hour segment;
> -Sustain an ordinary routine without special supervision;
> -Make simple work-related decisions;
> -Ask simple questions or request assistance;
> -Respond appropriately to changes in a routine work setting;
> -Be aware of normal hazards and take appropriate precautions.

  According to Dr. Cummins, Mr. White does not have a low IQ or reduced intellectual functioning; his mental impairment is not exacerbated by his physical symptoms; he is not a malingerer; his impairments are reasonably consistent with his symptoms and functional

limitations; and his limitations are not affected by alcohol or substance abuse. (Tr. 285−86). Dr. Cummins did not answer the question about the frequency that Mr. White's impairments or treatment might cause him to be absent from work. (Tr. 286).

There were no physical or mental RFC assessments undertaken by State agency medical consultants due to insufficient evidence in the record at the time of their review. (Tr. 22).

At the outset of the hearing before the ALJ, counsel for Mr. White moved to amend the alleged onset date to October 31, 2011. (Tr. 34). (White received unemployment benefits immediately following being laid off through October 2011 and reportedly intended to return to the work force.)

The ALJ determined at step one that Mr. White had not engaged in substantial gainful activity since October 31, 2011, the amended alleged onset date. (Tr.17).

At step two, the ALJ found that Mr. White's severe impairments consisted of: chronic neck pain with evidence of cervical degenerative disc disease; chronic lumbar pain with normal imaging, likely myofascial; and anxiety disorder (20 C.F.R. §§ 404.1520(c)) and 416.920(c)). (Tr. 17). The ALJ recognized that Plaintiff also suffered from depression and hypertension. (Tr. 17−18). However, the ALJ did not deem the depression and hypertension "medically determinable impairment[s] separate from anxiety." (Tr. 18).

At step three, the ALJ found that Mr. White did not have an impairment or combination of impairments that meet or medically equal the severity of one of the Listings. (Tr. 18−19). The ALJ was succinct in his explanation concerning Mr. White's spine impairments and the Listings criteria in section 1.00. (Tr. 18). The ALJ undertook a more detailed comparison of Mr. White's mental impairment and the criteria of Listing 12.06. (Tr. 18−19). Specifically, the ALJ determined that Claimant experienced only "mild" restrictions in daily living and social functioning. (Tr. 18).

The ALJ determined that Claimant experienced "moderate" difficulties in concentration, persistence, or pace due to the combination of anxiety and chronic pain.[7] (Tr. 18).

With respect to RFC, the ALJ determined that:

[C]laimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that he is further limited to sitting for thirty minutes at a time with an allowance to stand as needed for up to ten minutes at a time. The claimant can perform occasional climbing. The claimant is able to perform simple, routine, repetitive tasks in a stable work environment at a nonproduction pace.

(Tr. 19).

At step four, the ALJ found that Plaintiff was unable to perform his past relevant work as a supervisor of drywall application, which was characterized by the VE as "very heavy and skilled." (Tr. 22). The ALJ noted Claimant's age on the amended alleged disability date (45 years old) and that Claimant fell within the younger individual age range (18–49). (Tr. 22). The ALJ likewise noted that Claimant had a high school education, is able to communicate in English, and that transferability of job skills is not material to the determination of disability. (Tr. 22).

At step five, the ALJ found that considering Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. 23–25). Specifically, the ALJ relied upon testimony of a vocational expert ("VE"). (Tr. 23–25). The VE testified that Claimant was capable of performing the requirements of representative light, unskilled occupations such as a storage facility rental clerk (1,127 jobs in NC; 27,428 nationally), electronics worker (265 jobs in NC; 9,650 nationally), and laundry folder (2,500 jobs in NC; 82,334 nationally). (Tr. 23). The ALJ determined that Claimant was "not disabled." (Tr. 24–25).

---

[7] Dr. Cummins' opinion on the Mental RFC Questionnaire was that Mr. White's psychiatric condition did not exacerbate any physical symptoms. (Tr. 285).

## II. STANDARD OF REVIEW

Judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") is authorized pursuant to 42 U.S.C. §405(g), and is limited to consideration of (1) whether substantial evidence supports the Commissioner's decision and (2) whether the Commissioner applied the correct legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). District courts do not review a final decision of the secretary *de novo*. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). A reviewing court must uphold the decision of the Commissioner, even in instances where the reviewing court would have come to a different conclusion, so long as the Commissioner's decision is supported by substantial evidence. *Lester v. Schweiker*, 683 F.2d 838, 841 (4th Cir. 1982). In reviewing for substantial evidence, a court may not re-weigh conflicting evidence, make credibility determinations, or substitute its own judgment for that of the Commissioner. *Craig*, 76 F.3d 585 at 589. The administrative law judge, and not the court, has the ultimate responsibility for weighing the evidence and resolving any conflicts. *Hays*, 907 F.2d at 1456.

## III. THE ALJ'S EVALUATION PROCESS

The ALJ must follow a five-step sequential evaluation process to determine if the claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. First, it must be determined if the claimant is

involved in any substantial gainful activity. If he is, then the claimant is not disabled regardless of his physical or mental condition, age, education, or work experience. 20 C.F.R. §§ 404.1520, 416.920. Second, it must be determined whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe. If not, then the claimant is not disabled. *Id*. Third, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled regardless of age, education, or work experience. *Id*. Before moving to the fourth step, the ALJ must first determine the claimant's residual functional capacity ("RFC"). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. *Id*. At step four, if the claimant can perform the requirements of his past relevant work, then he is not disabled. *Id*. At step five, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. *Id*. The SSA is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do. 20 C.F.R. §§ 404.1512(g), 404.1560(c), 416.912(g), and 416.960(c). In this case, the ALJ concluded that the claimant was not disabled at step five, because he could perform the work of a storage facility rental clerk, electronics worker, and laundry folder.

## IV. DISCUSSION

The issues on appeal are (1) whether the ALJ properly evaluated the opinion of claimant's treating psychiatrist, Dr. Cummins and adequately explained why he only assigned "little weight";

(2) whether the ALJ properly accounted for claimant's mental impairments and related nonexertional limitations in his RFC analysis; and (3) whether the ALJ properly relied upon the testimony of the vocational expert in finding that a significant number of jobs existed in the national economy that claimant could perform.

For the reasons discussed below, the Court concludes that the ALJ's decision and VE hypothetical sufficiently accounted for the Claimant's severe mental impairment (Anxiety Disorder) and nonexertional limitation, including Claimant's moderate difficulties in concentration, persistence, and pace.

### A. The ALJ Accounted for Plaintiff's Moderate Difficulties in Concentration, Persistence, and Pace in the RFC and in the ALJ's Question to the Vocational Expert

An ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the RFC or the hypothetical question to the vocational expert to simple, routine, or repetitive tasks. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). *See also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (per curiam); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996). "As Mascio points out, the ability to perform simple tasks differs from the ability to stay on task. Only the latter would account for a claimant's limitation in concentration, persistence, or pace." *Id.* at 638. In *Mascio*, the ALJ stated that he found Mascio's claims that she suffered from a limitation in concentration, persistence, and pace on account of pain "less credible" and did not include the limitation in the RFC or the hypothetical question to the vocational expert. The ALJ did not explain whether he found it partially or completely incredible. *Id.* The Fourth Circuit held that remand was therefore appropriate because the hypothetical was potentially incomplete.

Here, the ALJ accounted for Mr. White's mental (nonexertional) RFC by limiting claimant to performance of "simple, routine, repetitive tasks *in a stable work environment at a nonproduction pace*." (Tr. 19) (emphasis added).

The restriction of a claimant to SRRTs does not always fully account for functional limitations related to mental impairment. *See e.g.*, *Williams v. Colvin*, 223 Soc. Sec. Rep. Service 484, 2015 U.S. Dist. LEXIS 168131, at *41-42 (W.D.N.C. 2015) (Voorhees, J.). The ALJ's additional qualifiers that Mr. White be limited to work / SRRTs 1) in a stable work environment and 2) at a nonproduction pace satisfy *Mascio*. The vocational expert testified that, notwithstanding Mr. White's exertional and nonexertional limitations, he had the residual functional capacity to perform light, unskilled work, including occupations such as a storage facility rental clerk, electronics worker, and laundry folder. As for stable work environment, there is substantial evidence *(even within Dr. Cummins' RFC opinion)* supporting the ALJ's determination that Mr. White is capable of performing SRRTs in a stable work environment.

As for the nonproduction pace, this language accomplishes the same goal as the RFC affirmed by this court in *Jarek* that claimant was able to perform simple, routine, repetitive tasks not at an assembly line pace." *See e.g., Jarek v. Colvin*, 2015 WL 10097516, at *10 (W.D.N.C. September 4, 2015) (substantial evidence supports ALJ's RFC analysis and specifically where moderate limitation in claimant's ability to maintain concentration, persistence, or pace; detailed analysis of treating physician's records and agency consultants resulting in RFC that limited claimant to "simple, routine, repetitive tasks not at an assembly line pace" complied with *Mascio*).

Here, to the extent Dr. Cummins opined that Mr. White was not capable of performing at a consistent pace and, therefore, unable to meet competitive standards (which is not entirely clear from the record), the additional functional limitation imposed by the ALJ that Mr. White's work

be "at a nonproduction pace" sufficiently addresses the nonexertional impairment.

For all of these reasons, the Court finds the ALJ's RFC analysis, hypothetical to the vocational expert, and decision is supported by substantial evidence.

**B. The ALJ Properly Evaluated the Medical Opinions and Substantial Evidence Supports the ALJ's Decision to Assign Less Than Controlling Weight to Dr. Cummins' Opinion**

Plaintiff White further asserts that the ALJ did not assign the proper weight to Dr. Cummins' opinion and did not adequately explain his reasoning for assigning less than controlling weight.[8] Dr. Cummins, Mr. White's treating psychiatrist since December 2010, opined that Mr. White is "seriously limited" as a result of his mental impairment. (Exh. 3F). The ALJ determined that Dr. Cummins' opinion was only entitled to "little weight" given that Dr. Cummins' opinion was based primarily on Mr. White's subjective complaints as opposed to objective findings. (Tr. 21). The ALJ also pointed to inconsistencies between Dr. Cummins' opinion as to Claimant's mental impairment and the record evidence as a whole. (Tr. 21−22).

When evaluating and weighing medical opinions, an ALJ considers: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d. 653 (4th Cir. 2005); *see also* 20 C.F.R. § 404.1527(c). A treating physician's opinion, however, is not entitled to controlling weight if there is substantial contradictory evidence in the record. *Craig v.*

---

[8] To the extent Plaintiff contends that *Mascio* applies to this issue, namely, the requirement that the ALJ adequately explain his rationale for the weight assigned to Dr. Cummins' opinion, *Mascio* does not govern on this point. Rather, *Mascio* is aimed at adequacy of the ALJ's RFC analysis. *See e.g., Scott v. Colvin*, 2015 WL 5567572, * 7 (September 22, 2015) ("Plaintiff is not arguing that the ALJ failed to conduct a function-by-function analysis, but that the analysis does not provide sufficient detail as to why the ALJ gave significant weight to one physician over another, which is incorrectly challenged under *Mascio*.").

*Chater*, 76 F.3d 585, 590 (4th Cir. 1996); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ assigned Dr. Cummins' opinion little weight because his opinion was found to be inconsistent with other aspects of the record, including Dr. Cummins' contemporaneous progress notes, which evidence only mild to moderate limitations. (Tr. 21). Dr. Cummins' treatment notes confirm that Mr. White benefitted from his medication regimen (Xanax). (Tr. 21). Significantly, Dr. Cummins did not change Mr. White's medication or dosage during the relevant time period. (Exh. 10F). As noted by the ALJ, the fact that no change occurred tends to indicate that Mr. White's symptoms were controlled. (Tr. 21–22). Another inconsistency identified by the ALJ is Dr. Cummins' Global Assessment of Functioning ("GAF") rating of Mr. White. (Tr. 22). Since December 2010, Dr. Cummins has deemed Mr. White a GAF of 64−65. (Exhs. 3F, 10F) "A GAF score in the range of 61 to 70 indicates some mild symptoms or some difficulty in social or occupational functioning; however, the individual generally functions pretty well with some meaningful interpersonal relationships." *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition (1994). Dr. Cummins' GAF assessment does not line up with his RFC opinion that Mr. White suffers from disabling limitations. Finally, although Mr. White received treatment from Dr. Cummins for nearly two years, at the time Dr. Cummins completed the form "Mental Residual Functional Capacity Questionnaire," Claimant had only been seeing Dr. Cummins for approximately six months. Given that the ALJ found Dr. Cummins' opinion to be inconsistent with the record as a whole, the ALJ properly assigned Dr. Cummins' opinion less than controlling weight. *See e.g., Scott v. Colvin*, 2015 WL 5567572, at *3–4 (W.D.N.C. September 22, 2015) ("The Court finds that the ALJ's decision to give the treating physician's opinion less weight is clearly articulated in the Hearing Decision and substantially supported by the evidence, particularly as to the ALJ's numerous findings of inconsistency within Dr. Jeffery's

opinions as compared to the record. Thus, Plaintiff's argument that the ALJ failed to properly weigh and provide reasoning for giving a treating physician's opinion less weight is without merit.")

### C. The ALJ Properly Relied Upon Vocational Expert Testimony

Finally, Plaintiff contends that the ALJ erred at step five of the sequential evaluation process because the testimony provided by the VE was not supported by documentary authority and was generally unreliable.[9] The Court disagrees. "The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50–51 (4th Cir. 1989) (citations omitted). In other words, *in light of the VE's expertise*, the purpose of VE testimony is to fill in the gaps where a rule or grid is not on all fours because a claimant is deemed unable to perform the full range of a category of work due to additional functional limitations. *See Pena v. Comm'r of Social Security*, 489 Fed. Appx. 401, 402–03 (11th Cir. 2012) (VE's knowledge and experience may supply a reasoned basis on which to support conclusions to reduce numbers of jobs without having to require the VE to provide documentary evidence to support reduction).

Plaintiff fails to identify any binding legal authority that requires a VE to restrict opinion testimony to what may be found in treatises or traditional written occupational / vocational-type

---

[9] Plaintiff, through counsel, after the evidentiary hearing, unsuccessfully petitioned the ALJ for issuance of a subpoena to the VE seeking production of underlying materials or authorities that supplied the bases for a particular aspect of the expert opinion, namely, the nature of the sit/stand option in the marketplace. Plaintiff's subpoena request did not comport with the governing regulations, 20 C.F.R. §§ 404.950(d), 41.1450(d). Equally significant, Plaintiff's counsel never sought to obtain the materials from the VE directly despite being advised that they would be made available for a fee.

authorities.[10] In the instant case, the VE arrived at a figure for available jobs for claimant by reducing a known or concrete job number by 75% to account for the inclusion of a sit/stand option. (Tr. 61–62). The VE testified that her numbers reduction was based on "job market analyses and [her] experience of how [she has] witnessed the jobs being performed." (Tr. 61–62). Although there were questions about how the VE decided to calculate the job numbers, there was no contemporaneous objection to the VE's qualifications, foundation for her testimony, or her methodology. The VE testimony constitutes substantial evidence to support the ALJ's step five findings of fact and conclusion of law that "other work" exists in significant number in the national economy that Plaintiff is able to perform. The Court will affirm the decision of the Commissioner.

V. ORDER

**IT IS, THEREFORE, ORDERED THAT**

(1) The Plaintiff's Motion for Summary Judgment (Doc. No. 9) is hereby **DENIED**;

(2) The Commissioner's Motion for Summary Judgment (Doc. No. 13) is hereby

---

[10] To the extent Plaintiff relies on the Seventh Circuit's outlier decision in *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2001), requiring a *Daubert*-like evidentiary scrutiny of a vocational expert's opinion and imposing an affirmative "duty to inquire" on the ALJ, the Fourth Circuit has not adopted that approach. *See e.g., Brault v. Social Security Admin.*, 683 F.3d 443 (2nd Cir. 2012) (acknowledging that the "duty to inquire" announced in *Donahue* exists only in the Seventh Circuit and that the Federal Rules of Evidence do not apply in disability proceedings); *Ellis v. Colvin*, 2014 WL 2862703, at *15–16 (W.D.Va. June 24, 2014) (ALJ reasonably relied on VE testimony based upon VE's experience in job placement; rejecting *Daubert* challenge to foundation of VE opinion and emphasizing that, "[e]xperts in nonscientific matters need not base their opinions on science, but may rely on their experience." ).

**GRANTED**;

(3) The final decision of the Commissioner is hereby **AFFIRMED**; and

(4) The Clerk is directed to administratively terminate this case.

**SO ORDERED**.

Signed: April 21, 2016

Richard L. Voorhees
United States District Judge